IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HILLARY WEATHERALL | * | Docket No. 2:22-cv-3096 |
| | * | Docket No. 2:22-cv-4322 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| | * | |
| SCOTTSDALE INDEMNITY CO. | * | Lake Charles Division |

-----------------------------------------------------------

| | | |
|---|---|---|
| MICHAEL POULLARD | * | Docket No. 2:22-cv-4032 |
| | * | Docket No. 2:22-cv-4724 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| | * | |
| LIBERTY MUTUAL INSURANCE CO. | * | Lake Charles Division |

-----------------------------------------------------------

| | | |
|---|---|---|
| PATRICIA LEDAY | * | Docket No. 2:22-cv-4169 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| | * | |
| INTEGON NATIONAL INSURANCE CO. | * | Lake Charles Division |

-----------------------------------------------------------

| | | |
|---|---|---|
| JOE MORSE | * | Docket No. 5:22-cv-4970 |
| | * | |
| | * | |
| VERSUS | * | October 20, 2022 |
| | * | |
| ALLSTATE VEHICLE & PROPERTY | * | |
| INSURANCE CO. | * | Shreveport Division |

-----------------------------------------------------------

```
            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF LOUISIANA

MICHAEL HATAWAY             *  Docket No. 1:22-cv-4740
                           *
                           *
VERSUS                     *  October 20, 2022
                           *
                           *
ALLIED TRUST INSURANCE CO. *  Alexandria Division

-------------------------------------------------------------

ABIGAIL ZENO                *  Docket No. 6:22-cv-4565
                           *
                           *
VERSUS                     *  October 20, 2022
                           *
                           *
ALLIED TRUST INSURANCE CO. *  Lafayette Division

-------------------------------------------------------------

BOBBY DYER                  *  Docket No. 5:22-cv-4961
                           *
                           *
VERSUS                     *  October 20, 2022
                           *
                           *
ALLIED TRUST INSURANCE CO. *  Shreveport Division

-------------------------------------------------------------

NATHAN JOUBERT              *  Docket No. 6:22-cv-5497
                           *  Docket No. 6:22-cv-5500
                           *  Docket No. 6:22-cv-5501
                           *  Docket No. 6:22-cv-5503
                           *  Docket No. 6:22-cv-5510
                           *
                           *
VERSUS                     *  October 20, 2022
                           *
                           *
FOREMOST INSURANCE CO.      *
GRAND RAPIDS, MICHIGAN      *  Lafayette Division
```

```
*****************************************************************
```

OFFICIAL TRANSCRIPT OF MOTION HEARING
HELD IN LAKE CHARLES, LOUISIANA
BEFORE THE HONORABLE JAMES D. CAIN, JR.,
UNITED STATES DISTRICT JUDGE

```
*****************************************************************
```

A P P E A R A N C E S

FOR THE PLAINTIFFS:  R. WILLIAM HUYE, III
                     GRANT P. GARDINER
                     McClenny Moseley & Associates
                     1820 St. Charles Avenue, Suite 110
                     New Orleans, LA 70130


REPORTED BY:         DEIDRE D. JURANKA, CRR
                     USDC - Western District of LA
                     611 Broad Street
                     Lake Charles, LA 70601

1    **COURT PROCEEDINGS**

2        THE COURT:  All right.  This is not my courtroom so

3    it's going to take me a minute.  Okay.  If I could have

4    you gentlemen make your appearances for the record while

5    I get myself situated.

6        MR. HUYE:  Yes, Your Honor.  William Huye on behalf

7    of the plaintiff, Mr. Hillary Weatherall.

8        THE COURT:  I'm sorry.  What's the other

9    gentleman's name?

10        MR. GARDINER:  Grant Gardiner.

11        THE COURT:  Okay.

12        MR. HUYE:  And, Your Honor, we have all three sets

13    of clients sitting in the --

14        THE COURT:  Okay.  Great.  I'm going to want to

15    hear from them in a minute.

16        MR. HUYE:  Yes, Your Honor.

17        THE COURT:  The reason for the -- let me call these

18    cases first.  This is, for the record, 22-03096,

19    Weatherall versus Scottsdale.  I think I'm saying that

20    right.  Am I saying that name right, Weatherall?

21        MR. HUYE:  Yes, Your Honor.

22        THE COURT:  Then there's a second Weatherall,

23    22-04322.  Poullard versus Liberty Mutual, this one's

24    22-04032.  Leday versus Integon National Insurance is

25    22-04169.  Then the second Poullard case is 22-04724.

1          Let me preface this by this.  I have not seen you

2     guys in my court.  I've had hurricane litigation going

3     on for two years.  We've gotten through about 3,000

4     cases, settling the cases, going through my case

5     management order, working the cases up.  And it's been a

6     very, I think, efficient process.  We've had about a

7     90 percent settlement rate in the case management order.

8     We have law firms from around primarily in this area.

9     We have some from southeast Texas.  They've all done a

10    very good job of working their cases up, taking them

11    through the case management order.  The insurance

12    companies have -- I'll commend most of them.  I've got a

13    couple that still kind of fight a little bit on some

14    things, but I think for the most part they bought into

15    the system and we've had a good working relationship on

16    both sides in getting the cases resolved.

17         I expected a surge of cases at the end of the day.

18    Most of the law firms that Special Master Juneau

19    contacted, several of the law firms that have been

20    filing a lot of cases, they were told -- we were told we

21    would have maybe 200 from some firms, 300 as they were

22    wrapping up getting the last ones in.  Most firms

23    stopped taking cases at least a week to two weeks out

24    knowing they had to prepare those lawsuits and get them

25    filed.  Then here come you guys and you file 1629

1    lawsuits in two days, and I'm -- you have clogged up the

2    system.  You have wasted judicial resources having to

3    deal with your mess because you didn't do your job on

4    the front end, the way the Court sees it.  You're not

5    going to clog up my system.

6         I have questions.  I'm going to let you have an

7    opportunity to explain yourself and tell me how this

8    happened.  I'm open, but I'm trying to give you a

9    preview of what the problem I have.  The other problem I

10   have is I question to a great extent based on what I've

11   seen and what my clerk's office has given me that, one,

12   do you even represent some of these people and, if you

13   do represent them, before you filed their lawsuits did

14   you meet with them, did you talk to them, did you vet

15   out as officers of this court.  And under Rule 11, one

16   rule, not necessarily the only rule, as officers of the

17   court you signed pleadings, you filed them into this

18   court with the understanding that you as officers of the

19   court did a good faith attempt to verify the allegations

20   you made in the pleadings.  And if you did not, that's

21   sanctionable.  And I will sanction you over and over and

22   over again in each case because I don't think --

23        You know, I think that's what's wrong with the

24   world today a little bit.  There's no consequences.

25   People run around going I don't have to -- I do what I

```
1        want.  Listen, you're fixing to have a child, I think.
2             MR. HUYE:  Yes, Your Honor.
3             THE COURT:  Congratulations.
4             MR. HUYE:  Thank you.
5             THE COURT:  Hardest thing to do in the world is
6        discipline your kid because you love them; but God knows
7        we need to discipline them so they learn and they don't
8        make the mistakes down the road, they take
9        responsibility for their actions.  I think that's part
10       of the problem today.  So I'm really here to try to help
11       you guys learn this is not the way to do business, this
12       is not the way to practice law.  That may be your firm's
13       business model and y'all see dollar signs and you're
14       going to come in --
15             This is not a mass tort settlement situation.
16       You're not going to come in here -- I'm just going to
17       warn you now.  I've already heard that y'all sent
18       letters out to some of the insurers with spreadsheets
19       saying here's our cases, we want to do a mass mediation.
20       Not going to happen.  You're not going to mass settle
21       these cases.  These people are individuals.  They have
22       individual claims.  Each of them is different.  Each of
23       them's problems are different.  And you have a duty as
24       lawyers to them to represent their interest, work their
25       claim up individually, and get them the best result
```

1     possible.  My job is to administer justice and to

2     protect the public, protect the bar, and protect the

3     judicial process.

4          So you may go try to pull this stunt in Florida

5     because I've already seen y'all's advertisements.  Shame

6     on you.  Shame on you for trying to prey on people.  I

7     think personally that's what you do, but maybe after

8     today y'all will take a different approach.  I know your

9     firm's some Texas firm, and y'all look like good young

10    lawyers.  And I'm trying to -- I want you to know now if

11    you get a bar complaint against you, you get sanctions

12    against you, it follows you as lawyers.  It follows you.

13         I'm the luckiest person in the world to have this

14    job.  This is the greatest job in the world as a lawyer

15    and I'm blessed to have it, but I can tell you if I had

16    a bar complaint or I had the kind of things that y'all

17    are -- I wouldn't be sitting here.  That would have been

18    a nonstarter for the United States Senate, probably for

19    the President.  You got -- the only thing you got going

20    forward in this world is your reputation, and as lawyers

21    your reputation follows you.  You get a bad one, it's

22    really hard to shake it.  And y'all are some young

23    probably smart lawyers, but I'm telling you y'all got to

24    tighten up.  And if you don't tighten up, I'm going to

25    tighten it up for you.

1          So I don't -- look, I've lectured more to y'all
2     than I do to criminal defendants.  I don't lecture
3     people usually, but I want you to understand where I'm
4     coming from.  I really want to understand how this
5     happened and what y'all are trying to do because it
6     really bothers me.  I've talked to the Chief Judge of
7     the Western District, my Chief Judge.  I've talked to my
8     other colleagues in this district.  All your cases are
9     going to be assigned back to me.  I'm going to monitor
10    y'all, and I'm really doing it to protect the public
11    back here.
12         So explain to me, first of all, how you end up with
13    1600 cases and file them in three days, because what
14    everyone else has been doing is they tried to settle the
15    case pre-suit.  If they couldn't, they filed a suit
16    right then and they'd get them in the process.  It was a
17    continual process.  Yes, I had a few firms file 100, 200
18    suits because they had to wrap up.  I get that.  That
19    happens.  But 1600?  And I hadn't really seen y'all.  I
20    seen y'all filed a few maybe last year.  Explain to me
21    how this -- how this happens.
22         MR. HUYE:  Yes, Your Honor.  We definitely take it
23    with great responsibility.  We're trying to help people.
24    These are hurricane victims.  We take that very
25    seriously, and we're trying to do our best to help our

1      state and our community in the best way that we can.

2          THE COURT:  Can you hear him, DD?  You may need to

3      turn that mic.  You can stay at the table if you want,

4      if you'd just turn that mic around just so she can hear.

5      I'm having a little trouble hearing you.  I'm getting

6      old.  I can't hear as good as I used to.

7          MR. HUYE:  Is that better, Your Honor?

8          THE COURT:  Yeah, that's perfect.

9          MR. HUYE:  All right.  Yeah, I mean, we take this

10     very seriously.  We're trying to help people.  There's a

11     whole lot of people that need help, and I think we're

12     trying to do our best to scale.  Because obviously if no

13     attorney would have signed up these hurricane victims,

14     they would have lost out on their rights because of the

15     statute.  So we were put under a lot of pressure to try

16     to rise to the occasion to help people.

17          Regarding why it was at the last second, Your

18     Honor, we had an extensive pre-suit mediation program.

19     We settled thousands of claims through that program.

20          THE COURT:  So you're saying to me that these 1600

21     suits you filed, you already had them for a while?

22          MR. HUYE:  Some of them, Your Honor, but not all of

23     them.  We did sign up a vast majority of these claims

24     kind of leading up to the statute of limitations.

25          THE COURT:  How many you think?  Ballpark it.  Out

1     of the 1600, is it 29, Toni, I don't know, 1629, how
2     many do you think you got in the last couple of days
3     before the prescriptive period?
4          MR. HUYE:  I'm not sure on the last couple of days.
5     I certainly could give a better figure on the last
6     couple of months if that would be helpful.  In the last
7     couple of days it was something about 40, 50 a day in
8     the last three days was really what I was --
9          THE COURT:  Let me ask you, I'd never even heard of
10    y'all.  I'll be honest.  Never heard of your firm.
11    How'd you get these cases?
12         MR. HUYE:  Yes, Your Honor.  Through a vast source
13    of advertising sources.  What we found is that it's not
14    necessarily that these hurricane victims are weighing
15    lots of different types of firms.  That's not what we
16    saw in the market.  What we saw is there's lots of
17    people, especially underserved communities, who didn't
18    know there was an opportunity to get help.  They didn't
19    know there was an avenue to be able to sign up.  And so
20    when we educated these hurricane victims about their
21    opportunities --
22         THE COURT:  And how did you go about doing that?
23         MR. HUYE:  Yes, Your Honor.  There's -- we sent out
24    mailers, flyers that would have come to people's homes.
25    We have billboards.  We've had buses.  We had radio ads.

1       I'm not privy to all of the details of what our
2       advertising department went through.  We certainly ran
3       everything by the bar.  But it's an extensive source
4       of --
5            THE COURT:  So you got signed off by the bar on the
6       advertisements?
7            MR. HUYE:  Yes, Your Honor, we do submit to the
8       bar.
9            THE COURT:  My understanding is y'all use a company
10      called Velocity.  Is that correct?
11           MR. HUYE:  For some of the advertising we do, Your
12      Honor.
13           THE COURT:  How did you then make contact with the
14      client at that point or how did they contact you and
15      enter into a contract to retain your firm?
16           MR. HUYE:  Yes, Your Honor.
17           THE COURT:  How did that happen?
18           MR. HUYE:  Yes, Your Honor.  It depends a little
19      bit on the advertising source.  But just for example,
20      the flyer, the flyer on the bottom that included kind of
21      a portal, if you will, a URL code where the client or
22      the potential new client could go online, read about us,
23      get some information.  If they would like to receive a
24      retainer agreement to review, there's an opportunity to
25      click a button and have one sent to them via e-mail.

1           THE COURT:  And then how would -- then if they
2      wanted to retain you, what would they do?  Was there
3      like a DocuSign or electronic signature?
4           MR. HUYE:  There was, Your Honor.
5           THE COURT:  Okay.  But then at that point then
6      they've retained you.  They're your responsibility.  We
7      can agree on that?
8           MR. HUYE:  Yes, Your Honor.
9           THE COURT:  At that point you represent them.
10          MR. HUYE:  Yes, Your Honor.
11          THE COURT:  So what was your firm's process, then,
12     for meeting with these individuals prior to filing a
13     suit for them?
14          MR. HUYE:  Yes, Your Honor.  We used a DocuSign
15     platform called AssureSign that we can launch out of our
16     CRM platform.  And the one that we sent out in advance
17     of the lawsuit, it was a document that basically would
18     ask the client to confirm certain policy information to
19     make sure that it was accurate and then to ask
20     permission from our clients to invoke appraisal and also
21     to file a lawsuit.  And so a client, if they wanted us
22     to file a lawsuit, would click yes.  And if they did not
23     want us to file a lawsuit, then they would say no and
24     sign it.
25          THE COURT:  And you have all this data?

1          MR. HUYE:  Yes, Your Honor.  There were a

2     percentage of the clients who we sent out the DocuSign

3     letter to and we simply couldn't get in touch with them.

4     We called dozens and dozens of times.  We sent dozens of

5     e-mails and texts.  And in those instances we sent out a

6     follow-up letter that said we've desperately tried to

7     get in touch with you with the contact information you

8     provided, we can't get in touch with you.  Your Honor,

9     as we were discussing before, they're our

10     responsibility.  So in those instances we did elect to

11     file suit to protect their rights as we continue to

12     follow-up with them.  But, Your Honor, this is the

13     minority of the claims.  The majority responded very

14     positively to the opportunity to fill out the DocuSign

15     letter.

16          THE COURT:  Okay.  And so the DocuSign letter, is

17     that your contract of retention with them?

18          MR. HUYE:  No, Your Honor.

19          THE COURT:  That's a separate --

20          MR. HUYE:  Yes, Your Honor.

21          THE COURT:  You sent them a separate contingency --

22     I'm assuming you're working on a contingency fee.

23          MR. HUYE:  The second letter doesn't necessarily

24     talk about any sort of professional fees or anything

25     like that.  It's only collecting additional information

1          almost like a questionnaire.

2              THE COURT:  You do that first?

3              MR. HUYE:  No, Your Honor.  They sign the retainer

4          first.

5              THE COURT:  First?

6              MR. HUYE:  Yes, Your Honor.  Sometime thereafter we

7          send the additional --

8              THE COURT:  How does the retainer agreement get to

9          them?

10             MR. HUYE:  Also through the DocuSign system.  It

11         just would have come prior --

12             THE COURT:  They get that first.  I'm sorry.  I'm

13         slow sometimes.  Then you send the questionnaire to

14         them, and then you would file the suit?

15             MR. HUYE:  Yes, Your Honor.

16             THE COURT:  My concern is this all happened so

17         fast.  That's why I'm trying to understand how these

18         cases got into your firm and in what timeframe did they

19         get into your firm where I have hundreds of duplicate

20         suits being filed.  I have some suits that I've already

21         identified that have already been either dismissed by

22         this Court or they've settled and you filed another suit

23         for them.  And that is very troublesome to me because

24         that, to me, gives me a lot of indication that there's

25         not been the adequate client-attorney communication

1       because if you would have talked to these people you
2       would know better.  You would have asked them that.
3       That is the Court's concern.  So I'm trying to
4       understand your process because it's not one, it's not
5       two, it's a lot.
6              MR. HUYE:  Yes, Your Honor.
7              THE COURT:  So I'm trying to gather how you guys
8       met with 1629 plaintiffs before you filed suit because I
9       think, personally, you have a duty and obligation to
10      meet with them.  Maybe you can't meet with them in
11      person, but you should at least talk to them on the
12      phone.
13             MR. HUYE:  Yes, Your Honor.
14             THE COURT:  I think, personally, you should meet
15      with them personally; but I can't sit here and tell you
16      that every client, every retain me -- you know, because
17      I had companies that would call me from out of state
18      saying, hey, we'd like to retain your services and a lot
19      of stuff would happen initially on the phone.  So I'm
20      not saying that can't be done, but the biggest -- when
21      were you admitted to the bar?
22             MR. HUYE:  2018, I believe, Your Honor.
23             THE COURT:  When?
24             MR. HUYE:  2018.
25             THE COURT:  When were you admitted?

1          MR. GARDINER:  Last year.

2          THE COURT:  Okay.  So y'all are two relatively

3    young lawyers.  2022, so you've been in the bar four

4    years, you've been in the bar less than a year.  One of

5    the biggest -- knock on wood.  I never had a bar

6    complaint filed against me in 30 years of practicing

7    law.  But the number one bar complaint filed against

8    young lawyers, lawyers in general, all lawyers, is lack

9    of communication with the client.  Happens a lot.  So

10   I'm trying to understand.

11         Also, I'm hoping y'all take something from today.

12   I'm not here, really -- I am here to fuss a little bit.

13   I'm not going to lie to you.  But I'm also here hoping

14   that you'll learn because I'm going to tell you if your

15   firm's business practice and your business model is to

16   do it this way, if I was you two I'd go find a different

17   firm to work for because this is not the way to do it.

18   I still don't think this is the way to do this.  So I'm

19   trying to understand out of 1600 suits how did you

20   communicate with this many people over that short period

21   of time?

22         MR. HUYE:  Yes, Your Honor.  This is not easy.

23   We're trying to help people that need help.  We're

24   having to move very quickly as individuals and as an

25   organization to try to rise to the occasion.  We bought

1    a call center so that we could handle volume of calls.

2    We have --

3         THE COURT:  Who do you have manning the call

4    center, lawyers?  Because non-lawyers cannot give legal

5    advice.

6         MR. HUYE:  Yes, Your Honor.

7         THE COURT:  Illegal practice of law.

8         MR. HUYE:  Yes, Your Honor.  Everything is things

9    that I've scripted specifically, and we're very careful

10   about how we give communications to the clients; but we

11   answer a thousand calls or more a day.  We send out

12   hundreds of text messages every day, hundreds of e-mails

13   every day.  We process --

14        THE COURT:  What you're telling me is you're giving

15   generalized pre-scripted responses.  You're not giving

16   the individual attention to the client where the client

17   has a question about his case, how would this affect it.

18   You're giving text messages.  You're telling me you're

19   giving pre-scripted responses from a call center to

20   people.  So how are they really informed?

21        MR. HUYE:  Yes, Your Honor.  So it depends on the

22   type of question from a client.  If the client is

23   calling in to say have you assigned an estimator on my

24   claim yet to come out to my home, right -- and my firm

25   fronts the money to have that expert come out.  We put

1          together an individual investigation with a photo report
2          and an estimate on every single claim, and we do it very
3          quickly.  So sometimes the client may call in to say,
4          hey, have you assigned my claim to an estimator yet.
5          And in that case, Your Honor, it would be appropriate
6          for someone in a call center to read a script.  And we
7          have a very sophisticated technology platform, a CRM
8          system which has a status, which as my team goes out and
9          assigns estimators it would change the status from need
10         to assign estimator to estimator assigned.  In that
11         instance, Your Honor, we've made the decision that it
12         would be appropriate for someone in a call center to be
13         able to help us with communication and to read that
14         status and then confirm yes, an estimator has been
15         assigned, just as an example.
16              THE COURT:  So of the 1600 suits you filed, how
17         many of them have had estimators go out to these
18         people's homes and do a report?
19              MR. HUYE:  Your Honor, the answer should be
20         100 percent.  However, some of our clients have been
21         difficult to get in touch with.  Hundreds of times we've
22         reached out communicating with them.  The last step will
23         be a knocking campaign with clients that we've signed.
24         But it is the vast minority that don't have estimates
25         yet.  Usually it's about within 21 days of signing, is

1    our average of receipt of an estimate back.

2         THE COURT:  So if you're going to go to all that

3    trouble, which I think is a good process to do, to

4    individually go out to these people's homes, if that's

5    what you're doing, that's good.  I think that's the

6    right way to do it.  So I guess what I'm having trouble,

7    then, connecting that dot to the dot that I'm hearing

8    from some insurers that y'all are sending out

9    spreadsheet letters saying, hey, we got this many cases,

10   we want to do a mas mediation.  How do you mass mediate

11   when everybody has an individualized claim?  How do you

12   do that?

13        MR. HUYE:  Yes, Your Honor.  I've been doing it for

14   years and years.  I started with Superstorm Sandy,

15   Harvey with Judge Edison.  So the way that we do it is

16   we have a spreadsheet that attaches to a position paper.

17   In the spreadsheet you have to enter in the

18   individualized information, right.  You have to enter in

19   the amount of the estimate from an estimator that went

20   out there.  We have to go through the insurance

21   company's claim file, have to pull out the prior

22   payments, right, and then find the remaining in dispute.

23   We then go out and find the timings of their payments.

24   Our belief is that the law supports if they didn't pay

25   within 30 days of their initial inspection then

1          penalties are due.

2              THE COURT:  I agree with you.  I'm not disputing

3          that.  What I'm trying to understand, though, is when

4          you send the spreadsheet to the insurer and you want to

5          do a mass mediation of these claims --

6              MR. HUYE:  Yes, Your Honor.

7              THE COURT:  -- what I'm hearing when I hear that is

8          that you want to do, hey, I'm randomly, XYZ insurance

9          company, we got a hundred of your insured claims, we

10         want to mass mediate them, is what I'm understanding

11         this letter to -- I'm paraphrasing what it says.  That

12         tells me you're looking for a lump sum fee or a lump sum

13         settlement and you're going to have to figure out how

14         you're going to divvy that up among your clients.

15             MR. HUYE:  Absolutely not.

16             THE COURT:  Well, then you can't mass mediate them.

17             MR. HUYE:  Your Honor, if I may.

18             THE COURT:  Yeah, please.  That's why we're here.

19         I want to hear, I want to understand ethically how you

20         can do it this way.

21             MR. HUYE:  Yes, Your Honor.  So it's an extensive

22         document production in advance of this mass mediation.

23         So we would say -- for example, we have Scottsdale on

24         this list today.  Let's say we have 200 claims with

25         Scottsdale.  If we can find a counsel that will agree to

```
 1        set a mediation in maybe 45, 60 days so we have a
 2        deadline and then to say five weeks before provide to me
 3        your claim file.  All right.  I'm going to go through
 4        your claim file and do the exact analysis we're talking
 5        about with an estimate that we had done independently
 6        and comparing it to the insurance company's estimate.
 7        We're going to fill out a spreadsheet.  We're going to
 8        fill out a position paper.  And we're going to have all
 9        of this information which we're going to send to you,
10        the insurance company, at least two weeks prior to the
11        mediation.  We're then going to show up fully prepared,
12        fully prepared, and say, look, our position is if we
13        tried this case our best day in court is $375,000,
14        right.  We would like to go through the estimate very
15        quickly.  And, Your Honor, since we specialize in these
16        claims, we are excellent at reviewing estimates
17        exceptionally --
18             THE COURT:  Guess what, I specialize in them too.
19             MR. HUYE:  Yes, Your Honor.
20             THE COURT:  I've got 7,000 of them.  I'm pretty
21        savvy on them myself.  But my question is how do you go
22        through a hundred of them in a day at a mediation if
23        you're going to mass mediate?
24             MR. HUYE:  Yes, Your Honor.  We haven't done a
25        hundred in a day yet.  The most that --
```

1    THE COURT:  I'm just picking a number.
2    MR. HUYE:  Sure.  Your Honor, we have been able to
3    do 50 in a day, right.  And the way that we did that was
4    this process.  It takes a special defense counsel or an
5    adjuster that they may have hired who can keep up with
6    the pace and basically --
7    THE COURT:  You know, look, you've got the
8    insurance company here on their heels a little bit
9    because -- and I think that's part of your business
10   model.  You know that.  That's why I told you I know you
11   dumped these cases on me at the last minute on purpose.
12   That's your business model.  I'm sorry.  You can deny
13   it, but it's what you did because you get the insurer on
14   their heels.  And they want closure, man.  They want out
15   of here.  You come to them and go, hey, you got
16   authority to get rid of 50 cases and we can do it for
17   60¢ on the dollar, they'll take that deal all day long
18   and you can't blame them.  They're a business.  They're
19   running a business.  But the people you represent, I'm
20   afraid, are disserved.
21   MR. HUYE:  We will not be mediating or negotiating
22   claims in that fashion.  I can --
23   THE COURT:  Here's what we're going to do.
24   MR. HUYE:  Yes, Your Honor.
25   THE COURT:  We're going to talk about some other

1       cases in a second.  You're going to go through my case
2       management order.  You're going to use my mediators that
3       I've assigned in the case management order through the
4       special master so I can be assured that that process is
5       going to work as you've just described it because there
6       will be no mass settlements.  You can't do it in a
7       hurry.  Everybody's claims are too individualized.  I'm
8       not going to allow it.  It's just not going to happen.
9       I have a duty to protect the public.
10              I grew up in southwest Louisiana.  I went to
11      McNeese.  I saw this community torn apart.  And if I
12      leave this bench with one legacy, it's that I protected
13      the public the best I could.  I can't protect everybody,
14      but I want to give everybody their day in court.  I want
15      to be sure they get adequate -- some of the insurers
16      have been horrible, haven't paid people.  I agree they
17      need counsel, but I got to be sure it's done right.
18              MR. HUYE:  Yes, Your Honor.
19              THE COURT:  So if that's the way you're doing it, I
20      can see it.  But my other question for you, then, is as
21      you go to this mass mediation, so to speak, you have to
22      have authority from your client to settle the case.  You
23      can't settle a case without your client's permission.
24      What do you do prior to -- I'm trying to understand your
25      business here.  How do you get your client's

1          permission --

2               MR. HUYE:  Yes, Your Honor.

3               THE COURT:  -- to settle that case?  Most people

4          bring their clients to my mediations.  You're not

5          bringing that many people, I'm assuming, to these

6          mediations because you couldn't do it.  I'm trying to

7          understand how -- I think you should inform them that

8          they have a right to be at the mediation.

9               MR. HUYE:  We do.

10              THE COURT:  So how do you communicate with your

11         client in terms of getting authority to settle the case?

12              MR. HUYE:  Yes, Your Honor.  About two weeks before

13         mediation -- the clients obviously already know that

14         their claim is up for mediation, but we inform them

15         that -- two weeks before, once we have the position

16         papers all put together, we kind of have that final

17         evaluation complete, we give each and every one of our

18         clients a call and we go through what are the best cases

19         at trial, how long kind of we're expecting it would take

20         to get there, what involvement it would take from them

21         to get to that level.

22              These are normal people.  They have jobs that they

23         would have to take off.  Most of our clients, I would

24         say almost every client, has no interest in showing up

25         to a mediation.  If there's an opportunity to

1    participate by phone and stay at work, they absolutely

2    want to do that.  They've been through enough.  They

3    need every penny they can get to keep their life

4    running.  So what we do is we get advance authority on

5    every single --

6         THE COURT:  No, I understand you'd get advance

7    authority.  I agree.  But I just want to be assured that

8    you're communicating with these people and they're

9    adequately informed about the good parts of their case,

10   the problems they may have with the case, if there's any

11   coverage issues.  I mean, the biggest issue in most of

12   these cases is not coverage, it's more about scope and

13   cost.  And some things aren't covered, some things are.

14   That's why there's just no way you can settle these in

15   mass because every policy can -- I've seen thousands of

16   them.  They're all a little different, different

17   insurers.  Even within insurers there's different types

18   of policies with different provisions depending on what

19   the customer paid for.  So it seems to me to be -- you

20   jammed all this in at the last minute and it just seems

21   very difficult to me how you managed your ethical duty

22   to your client.  It concerns me.  I'm not going to lie

23   to you.  I'm hearing what you're saying, but I'm being

24   honest with you.  I'm not a hundred percent convinced

25   it's the exact right way.  I can't say.  I don't know.

 1           MR. HUYE:  Yes, Your Honor.  Regarding some of the
 2     CMO mediators, we've mediated previously with Mr. Jeff
 3     Cole.  I've done several rounds with him.  I think he's
 4     a fantastic mediator, one of the best we have in the
 5     state.
 6           THE COURT:  He is.
 7           MR. HUYE:  And he's seen the exact model that we've
 8     used before on -- I think the most that we've ever done
 9     with Mr. Cole is perhaps 10 or 12 in a day.  We never
10     got --
11           THE COURT:  I could actually see that.
12           MR. HUYE:  Yes, Your Honor.
13           THE COURT:  That would be the max, though, I think
14     you could legitimately get through in a day.
15           MR. HUYE:  And, Your Honor --
16           THE COURT:  I know some of the local lawyers for
17     some of the insurers with the local firms I've had
18     dealings with, you know, they'll say, hey, look, we've
19     got six State Farm claims, let's try to get these six
20     with one firm, so for efficiency they get the mediator
21     there.  So I think that's a reasonable number.  I don't
22     think you can do more than that in a day.
23           MR. HUYE:  Yes, Your Honor.  We try to be as
24     efficient as we can.  We want to help people.  We
25     understand timing is of the essence.  They need the

1    money now to be able to get their lives repaired, and

2    we're doing what we can to try to help with that.

3         THE COURT:  So far -- so I told you when you were

4    here last time and I'm going to tell my mediator, you're

5    not charging 40 percent.  That's a ridiculous fee.  I

6    practiced law for 30 years and I only charged 40 percent

7    in two types of cases, medical malpractice and products

8    liability.  That was it.  I think most lawyers in this

9    community are charging 25 percent if the case settles.

10   I've had two hurricane trials and penalties and

11   attorney's fees were awarded by the jury, but I

12   determined the penalties and attorney's fees under the

13   statute.

14        MR. HUYE:  Yes, Your Honor.

15        THE COURT:  One firm had a 25 percent contingency

16   contract.  I gave it to them.  Other firm had a third.

17   I think that was very reasonable.  They tried the case

18   all the way to verdict.  I gave them their third.  But

19   if you're settling these pre-suit like this, there's no

20   way in a hurricane situation you should charge people

21   40 percent.  That's highway robbery and I'm not going to

22   allow it.

23        MR. HUYE:  Yes, Your Honor.

24        THE COURT:  We're going to get to that in a minute

25   because the history and what I've seen -- I've seen an

1    order out of the Southern District of Alabama against

2    your firm where there was a restraining order against

3    your firm, I have it here somewhere, by some attorney

4    that worked for y'all's firm.  I'm just telling you,

5    y'all don't have -- and I'm going to be honest with

6    you --

7         MR. HUYE:  Your Honor, if I may.

8         THE COURT:  Yeah.

9         MR. HUYE:  That was a dispute between a partner --

10        THE COURT:  Yeah, I know; but clearly -- I know it

11   was a dispute with a partner, but here's what else I'm

12   going to tell you.  I saw -- somebody sent me the video

13   off a Facebook page from some company called Disaster

14   Solutions.  I don't know if you're in it, but you're in

15   it.

16        MR. HUYE:  Yes, Your Honor.

17        THE COURT:  I did not appreciate your cavalier

18   comments in that video about my court, we broke the

19   system, we filed, we set a record.  No, you didn't break

20   our system.  Our system is set up to not allow more than

21   $24,000 in any one day on one account.  Y'all called my

22   clerk's office and said, hey, we can't file any more

23   suits.  We said, yeah, because there's a $24,000 cap in

24   a 24-hour period on any one account.  So you didn't

25   really say the truth.  You know, my curiosity is will

1     you go back on Facebook and say, hey, I made a mistake,

2     we didn't break the system.  I doubt it, but my point

3     is --

4              MR. HUYE:  (Indiscernible.)

5              THE COURT:  And then I see a bunch of people in

6     your office drinking daiquiris while you're claiming

7     you're filing suit.  Court doesn't appreciate that.  To

8     me you're not doing the profession of practicing law any

9     favors, not doing yourself any favors, popping out on

10    Facebook about how you're doing it.  It doesn't look

11    good.

12             MR. HUYE:  Yes, Your Honor.

13             THE COURT:  Why I don't do social media.  So I have

14    concerns.  I have concerns.  And the reason I really

15    have concerns is I'm not -- for example, let's get to

16    this one here.  Is your client in the Leday versus

17    Integon here?

18             MR. HUYE:  They are, Your Honor.  Ms. Leday's in

19    the back.

20             THE COURT:  Ms. Leday, would you mind coming up.

21    Let me tell you, Ms. Leday, y'all are not in trouble.

22    Don't worry about it.  Come up.  Relax.  I'm here really

23    to protect you-all.  Ms. Leday, if you'd give your name

24    for the record, ma'am.

25             MS. LEDAY:  Patricia Leday.

1          THE COURT:  My understanding, Ms. Leday, is that
2     you had a case in my court already filed where you'd
3     retained the Baggett McCall firm.
4          MS. LEDAY:  Yes.
5          THE COURT:  And that case was dismissed because --
6     voluntarily because you didn't have a cause of action.
7     Were you aware of that?
8          MS. LEDAY:  Yes.  Can I --
9          THE COURT:  Yes, please.
10          MS. LEDAY:  Okay.  Now, what happened is that I
11     didn't quite understand.  When they communicated with me
12     they told me about the force --
13          THE COURT:  Force-placed.
14          MS. LEDAY:  -- yeah, force-placed policy.  I
15     honestly didn't understand that.  All I knew is that I
16     was paying through my escrow for the insurance.  And I
17     explained to them the reason why I had a force-placed
18     policy is because I was with Geico before and at the
19     time when Geico did their yearly inspection they came to
20     my property, I was having some work done at my house and
21     there was debris all over my yard and part of the wall
22     was torn down.  And I explained to them I had, like, so
23     many days to get all that stuff done and the contractor
24     failed to do that so Geico dropped me.  And that's when
25     Midland Mortgage decide that they would put that policy

1      on me, but I -- because my understanding wasn't -- I

2      didn't understand, but I didn't know I was not going to

3      be the insurer on the policy but yet I knew I had to pay

4      it because they told me that my --

5             THE COURT:  Your lender.

6             MS. LEDAY:  -- my lender said it would go up.  So I

7      understood that because it's coming through my mortgage.

8      And so went Baggett McCall presented to me what happened

9      about the case being dropped they said that they had one

10     that was very similar to mine that didn't go through

11     because of the force policy.  So here I'm trying to get

12     in touch with my lender, mortgage company.  So what

13     happened is that because they talked to me, I don't have

14     documented proof, they said, "Ms. Leday, if you go ahead

15     and pay off your mortgage, you won't deal with us.  You

16     deal directly with the insurance company.  You skip the

17     middleman."  That's the only reason why I paid off my --

18     oh, I get emotional.

19            THE COURT:  Did you pay off your mortgage?

20            MS. LEDAY:  Yeah.  (Crying.)

21            THE COURT:  Take your time.  So you were able to

22     pay off your mortgage?

23            MS. LEDAY:  Yes.  When the insurance company gave

24     me the mortgage they asked me to go ahead and pay off my

25     house and that way it would kill them and I'd deal

1    directly with the insurance company.

2         THE COURT:  So when did you pay off your mortgage?

3    Did you pay it off after Baggett McCall dismissed your

4    suit?

5         MS. LEDAY:  That was right before.  That was before

6    because I didn't understand.  I thought --

7         THE COURT:  Here's the issue with force-placed

8    insurance.  You had a loan and you're required to have

9    homeowner's insurance when you have a loan because if

10   something happens to the house it's the collateral for

11   the loan.  The lender makes it a condition that you have

12   insurance.  And if you don't keep insurance on the

13   house, then they will go and force-place it, they'll buy

14   it, which is usually more expensive.  But the problem

15   with the force-placed -- and I've had this issue and I

16   think it's a terrible situation for people.  I don't

17   make the laws.  Congress makes the laws.  You don't have

18   a right of action against the force-placed insurer.

19   That's very settled in the U.S. Fifth Circuit.  Only the

20   lender can bring a lawsuit against a force-placed

21   insurer.  You don't have that right of action.  Because

22   they bought the policy, they're the named insured on the

23   policy.  You're not.  So that's why Baggett McCall

24   dismissed the suit.  I don't know the particulars of now

25   you're telling me you paid off the loan, then you can

1   keep that insurance and you become the named insured.  I

2   don't know.  I guess that's to be vetted out.  My

3   concern was this case was dismissed.

4        And what I was trying to understand is did you

5   communicate with her and did you know that she had a

6   prior suit?

7        MR. HUYE:  Your Honor, at time of filing we did not

8   know that.  We've had extensive conversations with

9   Ms. Leday since.  What we're going to try to work

10  together and do is to try to get an assignment of

11  benefits.

12       THE COURT:  Good luck.  I hadn't had that happen

13  yet with a force-placed insurer.  I'm sorry.  I'm just

14  going to be honest with you.  They usually come in --

15  I'll see if I have it here.

16       MR. HUYE:  Your Honor, Ms. Leday and I did discuss

17  if we're not able to get that then we would be working

18  together to get her permission to go ahead and

19  voluntarily dismiss.  We do agree that the force-placed

20  letter rules are well-settled law, but I wanted to see

21  if there was anything that I could do to vet and

22  investigate a little further anything I can do to help

23  her.

24       THE COURT:  I have it here.  I wanted to see what

25  the insurance company told me.  They moved to dismiss

1    the suit on October 15, 2021.  They make no mention in
2    here -- and I don't doubt you.  I'm just saying they
3    don't make any mention in here that you paid off the
4    mortgage.  But then I don't even know under their policy
5    would it transfer to you.  I don't know that.  Your
6    lender, I guess, told you that; but I don't know that I
7    would really on that from the lender, you know, to tell
8    you that.
9        MS. LEDAY:  They told me that so that's why I was
10   okay to pay it off.  They used the money from the
11   insurance to pay my mortgage off and some of the balance
12   and that was it.  I really thought I would be dealing
13   with the insurance company.
14       THE COURT:  That's the unfortunate thing I've had
15   with these force-placed policies.  People don't realize
16   when you get the force-placed insurance you don't
17   really -- the insurance is not yours.  It only belongs
18   to the bank.
19       MS. LEDAY:  Even though you're paying it out of
20   escrow?
21       THE COURT:  Even though you're paying it because it
22   was the term of your loan that you would keep insurance.
23   And when you fail or let it lapse or drop, then the bank
24   has the right to force-place the policy.  And you still
25   have to pay for it, but it's more expensive usually.

1     You know, it's the collateral for their loan.  You know,

2     if something was to happen to the house, the insurance

3     pays the bank and the loan's paid off.  So that's the

4     purpose of it.  My concern was did you discuss this with

5     your lawyers.

6           MS. LEDAY:  Well, when I spoke with him after the

7     fact, when they contact me, and that's when he told me

8     he was going to see about trying to go toward the lender

9     to see we can get them to put my name or get somehow I

10    can deal with the insurance company through the

11    approval.

12          THE COURT:  Well, you can try that.  I hadn't seen

13    it happen yet.  My concern was, to be honest with you,

14    why I wanted you here since you'd already had a suit,

15    did you retain this firm, McClenny Moseley, to represent

16    you?

17          MS. LEDAY:  Yes, sir, I did.

18          THE COURT:  I'll give y'all a chance to try to vet

19    this out.  Unfortunately, I'm not hopeful for you, I'm

20    afraid; but, you know, who knows.  It might happen.

21    Okay.  Thank you, Ms. Leday.

22          MS. LEDAY:  Thank you.

23          THE COURT:  Thank you for coming in.

24          MS. LEDAY:  Yes, sir.  Thank you.

25          THE COURT:  Now, let's look at -- let's talk about

```
 1        Weatherall versus Scottsdale.  Is Mr. or Mrs.
 2        Weatherall --
 3             MR. HUYE:  Weatherall.
 4             THE COURT:  -- here?
 5             MR. HUYE:  Mr. Weatherall, would you mind coming
 6        up.
 7             THE COURT:  How you doing, Mr. Weatherall.
 8             MR. WEATHERALL:  Doing okay.
 9             THE COURT:  Give your name for the record.
10             MR. WEATHERALL:  Hillary Weatherall.
11             THE COURT:  Where you from, sir?
12             MR. WEATHERALL:  Lake Charles.
13             THE COURT:  Scottsdale Insurance, they usually are
14        a commercial carrier.  Is this a business policy?
15             MR. WEATHERALL:  It's a homeowner insurance.
16             THE COURT:  How did you go about retaining this
17        firm to represent you?
18             MR. WEATHERALL:  Oh, this firm?  I seen an ad and I
19        replied to it.  I talked to, I guess, a representative
20        on the phone and they set up an appraisal estimator.
21        After they came by they said they would get back with me
22        after -- (indiscernible.)
23             THE COURT:  Did you review -- did you sign a
24        contract to retain them?
25             MR. WEATHERALL:  Yes.
```

1       THE COURT:  Do you know what the terms of that
2    contract is?  That's okay if you don't remember.  It's
3    not a test today.  I just want to know if you knew.
4       MR. WEATHERALL:  Not really, I don't.
5       THE COURT:  I'm really -- I told them the other day
6    I was going to randomly pull their cases because I had
7    concerns.  Unfortunately, y'all got pulled.  I know I'm
8    taking your time; but I have to know to protect you, the
9    public, and everyone else because I'm not happy about
10   the way this all went down.  So that's why I wanted to
11   verify that you retained them.
12      MR. WEATHERALL:  Yes, sir.
13      THE COURT:  Thank you.  Have you been satisfied so
14   far?
15      MR. WEATHERALL:  Uh-huh.
16      THE COURT:  Very good, then.  Thank you.
17      My question to you -- you can go ahead.  How is it
18   I got two lawsuits for the same claim?
19      MR. HUYE:  Yes, Your Honor.  Our team was moving
20   too quickly and we made a mistake.  We're going through
21   our docket right now to try to find any mistake that may
22   have been made.  We're triple checking.  We're in a
23   process of kind of contacting our clients and fixing all
24   the mistakes that we may have discovered.  But here,
25   Your Honor, it was a simple mistake.  We have filed the

 1   motion to dismiss on Civil Action ending in 04322, and

 2   we're going to continue filing those as quickly as

 3   possible to try to do anything we can to clean this up.

 4        THE COURT:  Yeah, I think that's a good idea.  The

 5   problem is what y'all don't understand by your

 6   sloppiness and the way you did this, I think Tina would

 7   agree, my courtroom deputy, you have created a

 8   tremendous amount of resources from my court to deal

 9   with this mess.  We're still docketing these cases.  Now

10   we have to docket dismissals.  You don't understand.

11   It's not simply filing a piece of paper.  People in our

12   clerk's office have to stop, they have to manually go

13   in, docket it into the Pacer system.  It's not just --

14   takes time.  In addition to all the other cases the

15   Western District -- we're the largest district in the

16   state.  We have 42 parishes covered from Monroe to Lake

17   Charles, Lafayette to Shreveport.  And so we have to use

18   our court resources to clean up your mess, and we're not

19   going to do it because I'm going to tell you now what's

20   going to happen.

21        You're going to be sanctioned $200 per case that's

22   a duplicate and you're going to pay it to the United

23   States District Court because the taxpayers of the

24   United States should not have to expend resources to

25   clean up your mess that you should have taken care of

1    beforehand.  That will be the order of the Court.

2         There will also be in the order you are not to --

3    there will be no mass settlements.  These cases will be

4    looked at individually.  I'm ordering you, you look at

5    them individually.  I'm not saying you can't go to

6    mediation with a multitude of cases on a given day

7    because that happens, but you better not go over

8    there -- I'm going to tell the special master there

9    won't be any 50 cases settled in a day.  Not going to

10   happen.

11        Ms. Poullard, Mr. Poullard, you here?  How you

12   doing?  Where y'all from?  Come on up.  Thank you for

13   coming.  If I could -- give your name for the record,

14   ma'am.

15        MRS. POULLARD:  Keatha Poullard.

16        THE COURT:  And, sir, your name for the record?

17        MR. POULLARD:  Michael Poullard.

18        THE COURT:  Where y'all from?

19        MR. POULLARD:  Lake Charles.

20        THE COURT:  Lake Charles.  I played college

21   basketball at McNeese and there was an Anthony Poullard

22   from DeQuincy.

23        MR. POULLARD:  He working at Firestone.

24        THE COURT:  Yeah.

25        MRS. POULLARD:  We're related.

1          MR. POULLARD:  We're related.

2          THE COURT:  I was wondering y'all related to

3     Anthony.  He's a good guy.  He's a good basketball

4     player, too.

5          MR. POULLARD:  He's a pastor now.

6          THE COURT:  Is he really?

7          MRS. POULLARD:  Yes, sir.

8          THE COURT:  Very good.  He was at Firestone, wasn't

9     he?

10         MR. POULLARD:  He still is.  He has a church in

11    Fenton.

12         THE COURT:  No kidding.  You see him, please tell

13    him I said hello.

14         MR. POULLARD:  I sure will.

15         THE COURT:  He's a good guy, really good basketball

16    player too.  How did you come to retain this law firm?

17         MRS. POULLARD:  Seen the ad on social media.  I was

18    looking for someone to help us deal with the situation

19    of the insurance.

20         THE COURT:  And did they communicate with you and

21    get the information they needed for your claim?

22         MRS. POULLARD:  Yes, sir.

23         THE COURT:  Okay.  Well, I just wanted to be sure

24    because I've got -- I'm going to get on some other cases

25    in a minute, but I just needed to verify.  I told them

1          the other day I was going to call in some of their

2          clients.  I wanted to be sure they were doing this the

3          correct way.  I want to be sure you're protected, the

4          public's protected, and that you're informed about your

5          case and they keep you in the loop.  Okay.

6               MR. POULLARD:  Yes, sir.

7               THE COURT:  You had a lot of damage from the storm?

8               MRS. POULLARD:  Yes, sir.

9               MR. POULLARD:  Yes.

10               THE COURT:  I understand.  I did too.  It's tough.

11          It's been very tough.  I think I have post-traumatic

12          stress.  Every time I hear about a storm in the gulf

13          now, I'm telling you, me and my wife just tense up.

14               MRS. POULLARD:  Yes, sir.

15               MR. POULLARD:  Me too.

16               THE COURT:  It's stressful.  And I just got back in

17          my house after a year and a half.  I mean, I had half my

18          roof blown off.  Fortunately, I was able to resolve it;

19          but it's very stressful so I feel for you.  This

20          building, we're just back in this building.  That's why

21          I'm not in my courtroom today.  We're still fixing this

22          building.  This building was totally damaged from the

23          hurricane.

24               Okay.  Well, I appreciate you coming in.  I

25          apologize for the inconvenience, but I felt like it was

1      my duty to just verify some of these things.  And so
2      y'all have anything you'd like to tell me?  Or you don't
3      have to.  Who's your -- yeah, go ahead.
4              MR. POULLARD:  We've been back in our house since
5      June 1st.
6              THE COURT:  Yes, sir.
7              MR. POULLARD:  And all our furniture was damaged.
8      I was about to get the check from Liberty Mutual, but
9      now they holding it because of this lawsuit.
10             THE COURT:  Yeah.  Once you file the lawsuit,
11     unfortunately, you got counsel now and they're not going
12     to turn it over to you.  They're going to turn it over
13     to your attorneys.
14             Now, I'm going to tell you two guys something.
15     That money was already coming probably before y'all were
16     retained.  Y'all should not take a fee on that contents
17     claim.  I can't tell them they can't, but they really
18     shouldn't.  Y'all should not take a fee on their
19     contents.  Y'all didn't do any work to help them get
20     that contents money.  Hopefully, maybe, y'all can get --
21     they can contact Liberty Mutual and go ahead and get the
22     contents claim resolved for you and get that money to
23     you so you can at least get your furniture and stuff
24     done.
25             MR. POULLARD:  Yes, sir.

1      THE COURT:  Where's your house at?

2      MR. POULLARD:  1314 Virginia Street.

3      THE COURT:  Lake Charles or Sulphur.

4      MR. POULLARD:  Lake Charles, yes, sir.

5      MRS. POULLARD:  It's been so stressful.

6      THE COURT:  Ma'am, I feel for you, I really do.

7    Listen, I'm going to tell you something.  That is why

8    I'm on top of this.  I really want to get these cases

9    resolved for you people.  The people of this town have

10   been through enough.  But I also have an obligation to

11   be sure you're not being taken advantage of.  I'm being

12   satisfied today, but I have to do my due diligence

13   because I live here.  I live with you.  I'll see you at

14   the grocery store.  Okay.  If you do see me at the

15   grocery store, please come say hello.

16      MRS. POULLARD:  Yes, sir.

17      THE COURT:  So we're going to get you -- I think

18   you're going to get your case resolved now.  Be a little

19   more patient.  It's getting there.

20      MR. POULLARD:  One more thing I want to mention.

21      THE COURT:  Yes, sir.

22      MR. POULLARD:  Being that the insurance company

23   took so long, I had a stroke.  I was stressed out.  And,

24   you know, I'm doing a whole lot better now but --

25      MRS. POULLARD:  He tried to go back to work; but

1        with the job that he does -- was doing at Firestone, he

2        made a mistake because the stroke affected him so.  So

3        they told him, well, either you take early retirement or

4        you're fired.  (Crying.)  And my husband has never been

5        fired from a job --

6            MR. POULLARD:  No.

7            MRS. POULLARD:  -- so he decided to take the early

8        retirement, and the insurance took so long.  Now, they

9        did pay for the rental.

10           THE COURT:  Have they paid for the rental?

11           MRS. POULLARD:  They paid, what, how many months?

12           MR. POULLARD:  Up to a year.  But then after the

13       year we had to pay ourselves.

14           MRS. POULLARD:  We had to pay out of pocket over

15       $3,000 a month and pay all the bills for at the house

16       that was being worked on.

17           THE COURT:  Well, I can't get into the merits too

18       much right now; but I appreciate the info, okay, because

19       Liberty Mutual's going to need an opportunity, you know,

20       to respond to the lawsuit and -- but I will tell your

21       attorney --

22           I'm going to tell you, this is a case where there

23       might be a 1973 claim; and that's why I'm very concerned

24       about mass settlements of these lawsuits.  These

25       people -- I don't know all the facts.  I got to wait for

1    the other side of the story.  But this is a case that

2    shouldn't go in there with 30 other cases.  They might

3    potentially have a 1973 claim for mental anguish and it

4    shouldn't be botched in there with a bunch of other

5    cases.  Really, this is where talking to your clients

6    and getting to know your clients and understanding what

7    their case is about is so important as attorneys.  You

8    have a duty to these people, and I hope y'all get what

9    I'm telling you and y'all are going to take these

10   people's cases seriously.

11       Listen, I've got an expedited process in place to

12   try to move these cases.  I'm sorry your case got filed

13   so late.  It probably, maybe should have been filed a

14   year ago, I don't know, and you'd already be halfway

15   through the -- probably already have it settled.  But

16   know the Court, we're working diligently to move these

17   cases.  You're not going to be waiting three years to

18   get a trial date with me.  You'll get one pretty quick,

19   and I don't continue hurricane cases.  This is why I

20   don't continue them because y'all need to get these

21   things resolved.  I really do empathize with you and

22   sorry you've had to go through this; but it's an

23   unfortunate part of life, you know.

24       MR. POULLARD:  Yes, sir.

25       THE COURT:  But know I'm on top of it.

1      MR. POULLARD:  All right.  Thank you, Judge.

2      MRS. POULLARD:  Thank you so much.

3      THE COURT:  Thank y'all.

4      MS. BENOIT:  How do you spell your first name?

5      MRS. POULLARD:  K-E-A-T-H-A.

6      MS. BENOIT:  Thank you.

7      MRS. POULLARD:  You're welcome.

8      THE COURT:  Maybe while y'all are all here in town

9  maybe you ought to sit down and really visit with these

10 people, since we're here, after.  We got witness rooms

11 out there.  Give you a chance to really sit down, talk

12 to these people and find out more about their case while

13 you're here.  Save you another trip to Lake Charles.

14 Talk to your lawyers, really maybe take an opportunity

15 to really get to know them.  I always found I was a

16 better lawyer when I really knew my clients and, you

17 know, I could empathize.  That's probably my problem.  I

18 was too empathetic.  Y'all almost got me to cry here.

19 I'm sorry.

20     MRS. POULLARD:  Thank you so much, Your Honor.

21     THE COURT:  Thank you.  God bless you.  Okay.  Meet

22 with them.  Y'all need to talk to them.

23     MR. HUYE:  Happy to, Your Honor.

24     THE COURT:  I'm just about done, but I do have a

25 couple more questions.  I want you to write this down.

 1      I want you to look at a case, Docket No. 22-4970.  My
 2   concern about this case, I'm going to tell you, is the
 3   residential address in this case is New Orleans and it
 4   was filed in the Western District.  There's no way -- I
 5   have yet to see a Hurricane Laura claim in the New
 6   Orleans area.  Y'all need to find out what's going on,
 7   why this happened.  To me, again, sloppiness.  It
 8   shouldn't have ever been filed, probably, unless there
 9   was some tornado that got thrown over to New Orleans,
10   which I doubt very seriously.  And what I'm telling
11   y'all is I'm going to continue -- obviously we're going
12   to continue to go through these cases, and we've got to
13   clean this mess up.  It has to be cleaned up.
14      The other thing I want you to look at is these
15   couple of cases right here.  Write these docket numbers
16   down.  I'm not here today on a rule to show cause on
17   these because I found these since then.  22-4740,
18   22-4565, and 22-4961, these were brought to my attention
19   by Allied Trust Insurance Company.  They're claiming
20   that they didn't even issue a policy for those people
21   and y'all filed a lawsuit for them.  How do you explain
22   that?
23      MR. HUYE:  Yes, Your Honor.  We're going through
24   this with some other counsel as well.  They're
25   communicating directly to us.  So, Your Honor, what

1      happened in those situations is we were approached by a
2      hurricane victim, they told us that they had a policy
3      with Allied or whatever other insurance company, and
4      they asked us to file a lawsuit.  So some of these other
5      counsel are reaching out to us and saying, hey, there
6      was no policy in effect.  It had recently expired or
7      whatever it may be.  We're immediately getting in touch
8      with our clients and saying, "Hey, this is what we're
9      hearing.  We need a copy of your dec. page.  I
10     understand that you may not have it.  I know you may
11     have been through a lot between the hurricane and now,
12     but can you please get with your agent.  It's incredibly
13     important."  And we're rolling through that, Your Honor,
14     as quickly as possible.  So if there was not a policy,
15     we will immediately get their permission to do a
16     voluntarily dismissal.  And if there is a policy, then
17     we're working with defense counsel to say, "Hey, I'm
18     sorry you may have missed it."  There may have been an
19     issue.  They're moving fast, too.  "Here's a copy of
20     declarations page."
21          THE COURT:  And this is the lesson to be learned.
22     This is why you don't wait till the last minute.  You
23     know, this is why most of the firms that I've dealt with
24     over the last two years that have done a lot of this,
25     most of them inform the special master that they quit

1    taking cases the week, even some -- I know one firm
2    locally quit two weeks before the deadline because they
3    needed time to say, hey -- you know, because of their
4    ethical obligations, they needed time to talk to the
5    client, get the suit filed, make sure they weren't --
6    you're the only ones that I got duplicate cases.  Not
7    one other firm out of 7,000 cases have filed a duplicate
8    lawsuit but you guys.  So that's why you don't wait till
9    the last minute.  And the way it appears to me, I mean
10    you may take issue with it -- okay.  This is why at the
11    last minute you get yourself in trouble and you create a
12    lot of problems for you, for the Court.  And the way it
13    appears on the surface, y'all are coming in at the
14    bottom and just trying to scoop up the bottom of the
15    barrel like a bunch of bottom feeders.  I'm going to be
16    honest with you.  That's the way it looks.  You can take
17    issue with it.  I'm not saying that's -- I'm just
18    telling you the way it looks on the surface.  It doesn't
19    look good because it's sloppy.
20    They just sent me -- I'm -- because we're still
21    going through them.  I'm telling you we're still going
22    through them.  Joubert versus Foremost Insurance
23    Company, Grand Rapids, Michigan, filed on October 4th.
24    Is that right, filed on -- how can it be filed on
25    October 4th?  Well, probably got docketed, maybe.

1    Here's the docket numbers.  You write these down.

2    22-5497, 22-5500, 22-5501, 22-5503, and 22-5510.  Y'all

3    filed six lawsuits for the same people six times.  Six

4    times you filed that same lawsuit.  They just --

5          We're going through them.  You'll be sanctioned

6    $200 per duplicate.  So that will be -- well, if the

7    first case is valid, so it'll stay.  The other ones

8    you're going to be sanctioned on.  I'm telling you don't

9    ever come back to my court.  God forbid we ever have

10   another hurricane, but I do not ever want to see this

11   again.  Hear me.  Tell your partners in Houston stay the

12   frick out of my court with this kind of trash.  You see

13   this person right over here?  That's Marshal Gallow with

14   the United States Marshal Service.

15         By the way, when I set the rule to show cause I had

16   three calls from your office on why you could not appear

17   today.  One was, "We have a trial."

18         I said, "Give me the name of the judge."  I don't

19   know who was it that called.  Do you remember the name?

20   Somebody in your office.  I said, "Give me the name of

21   the judge so I can call him and verify you got a trial."

22         "Oh, let me call you back."  Called back, "Oh, he

23   doesn't have a trial.  It's not a trial.  We have a

24   mediation.  We got mediation today."

25         I said, "I don't care.  You either go to your

1    mediation or follow a federal court order."

2         Then I was told, "Oh, well, it's got to be

3    exceptional circumstances.  We just can't show up next

4    week."

5         Let me tell you, you ever call my chambers again

6    and tell them you can't show up for a hearing Marshal

7    Gallow, she's your Uber.  She will be coming to New

8    Orleans and dragging you out of whatever you're in and

9    driving you over here.  It'll be the worst Uber ride of

10   your life probably.  Don't ever do that again.  You're

11   going to drop whatever you got going on.  Now, a trial I

12   might; but I'm going to call the judge you tell me you

13   got a trial.  I'm going to say, "Hey, you got a trial.

14   Go do your trial."

15        I got too many of these to work around your

16   schedule.  I don't work around your schedule.  You work

17   around the Court's schedule.  You file in this court,

18   you're going to live with them.  If you got to come to

19   Lake Charles a hundred times, you come a hundred times,

20   because I don't do Zoom.  Don't ever ask me to do Zoom.

21   I do not do Zoom.  Zoom is the worst thing I think ever

22   happened to this fricking country.  I didn't even have a

23   cell phone when I started practicing law.  We showed up

24   for everything.  School, that's the worse thing, school,

25   Zoom school.  People -- kids need to be in the

1    classroom.  You need to be in the courtroom.  Just hear
2    me on that and tell your partners the same thing.  If I
3    rule you into court, you show up.
4         Now, there are exceptional circumstances.  Death of
5    a family member, I'd move the hearing and I will do that
6    all day long.  Family's important.  You needed to go to
7    an appointment, I think.  That was an exceptional
8    circumstance.  I don't want to hear about I got
9    mediation, I got a hearing, I got all that.  Federal
10   court takes precedence over all that.  I don't care
11   about your mediations.  I only care about the cases in
12   my court.  You filed them and you're going to live with
13   them.  You're going to do it.  Listen, just hear me now.
14   If you think you're going to play games, you play them
15   but just remember one very important thing:  I make the
16   rules.  Okay.  So go forth, clean this mess up.
17        In the interim, here's what's going to happen.  I'm
18   staying all your cases.  They will be stayed until we
19   get all of this sorted out.  The duplicates have to be
20   out.  We got to clean it all up because I'm not sending
21   these through the case management order with multiple
22   cases.  It's more work for the special master than he
23   needs, more work for the Court.  So we got to get all
24   this cleaned up.  So an order will be signed today or
25   probably, maybe tomorrow, going to stay all 1600 cases

1    until further notice, until we can get all this sorted

2    out and cleaned up.  And then I will start releasing

3    your cases, probably in batches, for you to go forth and

4    start working them up.

5         You're also putting a tremendous burden on some of

6    the insurers trying to answer all these because my

7    deadlines don't know the difference.  We already had the

8    meeting with State Farm and I tried to give them some

9    relief.  And I'll tell you State Farm has been an

10   excellent company in trying to resolves cases.  They

11   started off a little rough, did want to settle at first.

12   We had a couple, I don't want to be sacrilegious, come

13   to Jesus meetings and they got right.  And State Farm

14   has done an excellent job of settling cases.  They'll

15   work with you and they're trying to do the right thing.

16   That's why I was able -- why I was willing to give them

17   some relief from y'all because you dumped them on them

18   and that wasn't fair to them.  So until we get it sorted

19   out, I'll be doing a written order on that, we're going

20   to stay them.  Are we clear?  All right.

21        Thank y'all for coming.  I'm sorry for the

22   inconvenience for y'all having to come today but I

23   needed to hear from y'all, okay, because this ain't

24   about me, ain't about the lawyers, it's about y'all.

25   Okay.  That's my primary concern, is those people and

1    the insurance companies.  They have a right to vet out

2    these claims.  You know, I'm not going to sit here and

3    tell you there's been some people trying to take

4    advantage of the claims process.  That's just the nature

5    of it, and we try to vet that out too.

6          But with that, we're adjourned.  Go forth and do

7    better.  Okay.  I want y'all to do better.  Y'all are

8    young lawyers.  Y'all got a long career.  I don't want

9    you to muck it up this early in your career.  Okay.  All

10   right.  Y'all can go.  Thank y'all.

11         MR. HUYE:  Thank you, Your Honor.

12         MR. GARDINER:  Thank you, Your Honor.

13              (Proceedings adjourned.)

14

15              * * * * * * *

16

17              **CERTIFICATE**

18

19    I hereby certify this 28th day of October, 2022 that the

20    foregoing is, to the best of my ability and understanding, a

21    true and correct transcript of the proceedings in the

22    above-entitled matter.

23

24              *Deidre D. Juranka*

25              Deidre D. Juranka, CRR
              Official Court Reporter